285 F.2d 683
 61-1 USTC P 9147, 128 U.S.P.Q. 30
 Eva R. MAYER, Executrix of the Estate of Edwin E. Mayer,
deceased, Harold J. Graves and Beulth F. Graves, Thomas O.
Meyer and Pauline Meyer, Augusta Kelly, and The Estate of
Raymond F. Kelly, deceased, Augusta Kelly, Residuary
Legatee, Appellants,
v.
UNITED STATES of America, Appellee.
 No. 16103.
 United States Court of Appeals Ninth Circuit.
 Dec. 9, 1960.
 
 Mautz, Souther, Spaulding, Denecke & Kinsey, Arno H. Denecke, William H. Kinsey, James R. Moore, Davidson, Duffy & Stout, Carl E. Davidson, Portland, Or., for appellants.
 Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Joseph F. Goetten, Helen A. Buckley, Attys., Dept. of Justice, Washington, D.C., C. E. Luckey, U.S. Atty., Edward J. Georgeff, Asst. U.S. Atty., Portland, Or., for appellee.
 Before POPE, CHAMBERS and HAMLEY, Circuit Judges;
 CHAMBERS, Circuit Judge.
 
 
 1
 A patent of one Gruber on a device called the Viewmaster has resulted in a commercial success, at least until someone makes a better one.
 
 
 2
 Gruber, on the license of his retained one half interest in the basic patent, has secured capital gains treatment and, thus, lower federal income taxes for the taxable years 1950, 1951 and 1952. Edwin F. Mayer, Harold J. Graves, Thomas O. Meyer and Raymond F. Kelly,[1] herein sometimes called the Sawyer partners who have shifted around their one half interest in a manner most difficult to follow, have been denied the relief[2] granted Gruber. (The Sawyer partners obtained the one half interest in the patent for assisting Gruber in working out manufacturing methods.)
 
 
 3
 It is not suggested that the shifts of the Sawyer partners in their interest were shrewdly designed to save taxes. If they get capital gains, and we so hold, they have just stumbled into them. The partners held fairly frequent meetings and recorded their transactions inartfully but with full ceremony. Sometimes a formal contract was made and signed. Other times they just 'resolved.'
 
 
 4
 The Gruber-Sawyer partner venture began in 1938 in a conversation between Gruber and Graves. Thereafter, while production methods and some marketing were developed, partner Mayer negotiated with Gruber. After three years, a formal agreement was entered into on February 24, 1942,[3] between Gruber and Sawyer partners doing business as Sawyer's. Essentially it transferred an undivided one half interest in the key Gruber patent to the Sawyer partnership. Also, the partnership, for a license on Gruber's retained half, agreed to pay a two per cent royalty. Another agreement of the same tenor was entered into on January 2, 1944. The latter is noteworthy mainly in that therein Gruber's royalty interest is raised to three per cent.
 
 
 5
 In the closing days of 1945 and the first days of 1946, World War II was over, the Viewmaster business of Sawyer's was doing well and the partners were making plans for a grander operation. Without the participation of Gruber, the minutes of Sawyer's and of the Western Photo Corporation, an Oregon corporation, reflect a new arrangement of the business with respect to Viewmaster and the Gruber patent. The rearrangement was apparently consummated on January 2, 1946. Under it, Sawyer's 'sold' its rights in the patent to Western Photo.[4] And Sawyer's agreed to pay a six per cent royalty to Western Photo. In turn, Western Photo agreed out of the payments to take care of the Gruber obligation for three per cent royalties due for Sawyer's continued use of the patent in its production of Viewmasters. For the first three years of this 1946 agreement, the second three per cent of the Sawyer's royalties was to be devoted (and we assume it was) by Western Photo to developing the foreign market for Viewmaster. This 1946 arrangement is significant because it provided that after the three year period of impounding the Sawyer partners' half of the royalties for the purpose of development by Western Photo, then Western Photo would be obligated to pay one half of the royalties received from Sawyer's to the Sawyer partners, not as partners, but in their individual rights. While it is not clear whether Oregon operates under an entity theory of partnership, still at this point we assume it to be obvious law that partners cannot take a partnership asset, put it into a trust, provide that the partnership will pay the trust for the use of the asset, the trust then pay each partner in his individual right for the same use and, by this ipse dixit, achieve the happy land of capital gains, albeit they may have separated income benefits to the individuals from the right to use held by the partnership.
 
 
 6
 But a very significant rearrangement in the Sawyer business occurred about five months after January 2, on or about May 29, 1946. Sawyer's, as a partnership, went out of business and Sawyer's Inc., an Oregon corporation, took over. Each partner-- Mayer, Meyer, Kelly and Graves-- assigned his partnership interest in Sawyer's to Sawyer's Inc. In exchange, he received stock in proportion to his prior interest in the partnership.
 
 
 7
 We cannot find in the assignments of the Sawyer partners to Sawyer's, Inc., any trace of transfer of the retained rights to the income specified for the partners in their individual status in the early January, 1946, agreement as made by the resolutions. The assignments in May, 1946, say:
 
 
 8
 'I hereby assign unto Sawyer's Inc., a corporation, all of my partnership interest in Sawyer's, a partnership, subject to payment of liabilities of said partnership, including the amount of open accound due me. My said $...............(figure varied as to respective partners).
 
 
 9
 'Signed (name of partner)'
 
 
 10
 At this point, in our view, there was for the first time a 'sale or exchange'[5] of a capital assets transaction. The individual partners new had a future right to royalty payments from the corporation and the corporation had a right to use the patent and the duty to pay in the future the old partners individually through Western Photo for the use of the patent. A separation in the legal identity of interest built on the old foundations had been achieved to which legal consequences must be attached, at least at the end of two and a half years, when the corporation Sawyer's, through Western Photo, would be obligated to pay the partners individually.
 
 
 11
 On January 18, 1949, at the expiration of the three years provided in the agreement of January 2, 1946, and at a time when the phase had been reached when the old partners were entitled to start drawing royalties for the use by Sawyer's Inc., of the Gruber patent, the parties sought legal counsel and drew up a new agreement effective from January 1, 1949. Gruber signed this agreement as well as the former partners and Sawyer's Inc., and Western Photo Supply Co.
 
 
 12
 The 1949 agreement did make some changes in the licensing bargain, but none in the basic arrangement of 1946 for Sawyer's Inc. to pay Western Photo and Western Photo to pay one half of the royalty to Gruber and divide the second half among the ex-Sawyer partners individually. Eventually, on Februaury 16, 1950, the 1949 agreement was modified to eliminate the now useless conduit function of Western Photo. Thereafter, Sawyer's Inc. was to, and did, pay the royalty payments to Gruber and to the former Sawyer partners, Mayer, Meyer, Graves and Kelly.
 
 
 13
 For 1949, 1950 and 1951, the years at suit here, the taxpayers reported their royalty payments as ordinary income. But later they filed timely claims, not allowed by the director, for refunds based on capital gains treatment of their receipts of royalty. At the end of the opinion we set forth the attachment which accompanied one of the many identical (as to substance) refund claims filed by the partners.
 
 
 14
 When the tax affairs of the Sawyer partners moved to court, the old partners, in their contentions, particularly in the pre-trial order, pointed to the 1949 agreement. Before the trial was done, they wobbled back to the 1946 arrangement and perhaps to points in between 1946 and 1949. The trial court in its opinion thought the partners were guilty of a variance between their refund claim and their claim in court and, thus, barred. This, said the court was sufficient to deny recovery.
 
 
 15
 We think the purpose of the whold rule against variance is to prevent surprise on the facts. It is true that it would have been better if the claimant in his claim:
 
 
 16
 1. Had explained a little more as to when and how 'Western Photo Supply Co. licensed the patents to Sawyer's Inc.'
 
 
 17
 2. Had listed the agreement and sets of minutes and agreements instead of saying: 'Evidence in support of the facts set forth in this refund claim are contained in certain corporate and partnership minutes and agreements as augmented and supplemented by the actions of the parties confirmed by the records of Sawyer's Inc. and Western Photo Supply Co. Such evidence will be made available or be submitted to the Director of Internal Revenue or his representative on request.'
 
 
 18
 But the appellants in their claim for refund untied themselves from the 1946 mast by therein saying, 'Whether or not the beforementioned patent rights were granted by claimants in 1946, such grant was completed subsequent to Decebmer 31, 1945, and prior to receipt of patent payments.' Thus, they laid a basis to retrace all of the central transactions from 1946 to 1951. To sustain here the position of fatal variance between claim to director and claim in court would be to revive the evils of common law pleading. The Commissioner has no reason to feel misled, if he does.
 
 
 19
 We are cited to no law that prevents parties from selling their patent interest, but reserving a royalty, to their own corporation at a fair price and getting the advantage of capital gains, just as they can do with other assets.
 
 
 20
 We do not list here all of the hurdles set up in the trial court to capital gains treatment on the ultimate royalty provided. All were eliminated (and we think correctly and we make reference to the trial court's opinion, Gruber v. United States, D.C., 158 F.Supp. 510) except the issue of variance and the issue of whether there was an event with a sale or exchange out of which capital gains could be generated. On these two issues we have noted our disagreement.
 
 
 21
 The government's brief is very able. But we cannot agree with it. Gruber obtained capital gains treatment. No appeal was taken. We allow them to the Sawyer partners individually, holding the most critical date was the transfer of the assets of Sawyer's, a partnership, to Sawyer's, Inc. But this date is not susceptible of isolation. It has to be interwoven with all of the transactions on the patent from 1942 to 1951.
 
 
 22
 The judgments appealed from are reversed for further proceedings consistent herewith.
 
 Appendix to Opinion
 Typical statement:
 
 23
 Attached to Refund Claim of Harold J. and Beulah F. Graves for the Calendar Year 1950; Reasos for Allowance of Claim.
 
 
 24
 The sum of $25,753.28 included as royalties in claimants' joint individual income tax return for the calender year 1950 should have been reported as long term capital gain taxable as such rather than as ordinary income, and the amount of refund claimed herein is the reduction in tax resulting from the elimination of such sum as ordinary income and the inclusion thereof as long term capital gain.
 
 
 25
 The beforementioned sum of $25,753.28 (hereinafter called the 'patent payments') was the aggregate amount received by claimants as the consideration payable to them during 1950 for the prior grant of all of their respective rights in an undivied interest in certain patents and processes of a stereoscopic nature and related patents and processes of a non-stereoscopic nature (hereinafter called the 'patents'). The grant of all claimants' interest in the patents was made during the early part of 1946 to Western Photo Supply Co., an Oregon corporation. Under such grant Western Photo Supply Co. obtained the exclusive tight to use, manufacture and sell under the patents, and claimants retained no rights in the patents except the right to receive payments for the grant of such rights, which payments were based upon a percentage of gross sales made by the grantee, and its assigns, under the patents.
 
 
 26
 Western Photo Supply Co. licensed the patents to Sawayer's Inc., an Oregon corporation, for a consideration based on gross sales equal to that payable by Western Photo Supply Co. to claimants (and to other grantors of interest in the patents), and during 1950 Sawyer's Inc. made the patent payments directly to claimants. Whatever the respective rights of Western Photo Supply Co. and Sawyer's Inc. may have been under the patents as between each other, the two corporations together had all the rights under the patents, including the exclusive right to use, manufacture and sell thereunder. As before stated, the only right of claimants under the patents was the right to receive a sum equal to a percentage of gross sales as consideration for the grant of all of their rights in the patents. The patent payments were received by claimants as such consideration payable in 1950.
 
 
 27
 Claimants' respective interests in the patents were acquired by them prior to January 1, 1945, under the terms of certain agreements with William B. Gruber and others, and through their interests in Sawyer's, a partnership. The patent accounting for the patent payments in which the claimants so obtained an interest was U.S. Patent No. 2,189,285, issued February 6, 1940. Whether or not the beforementioned patent rights were granted by claimants in 1946, such grant was completed subsequent to December 31, 1945, and prior to receipt of the patent payments. Consequently, there can be no doubt that the grant of claimants' rights in the patents occurred more than six months after claimants acquired their respective interests therein, and the patent payments were received by claimants as a portion of the consideration payalbe to them for such grant.
 
 
 28
 An undivided interest in a patent (such as the undivided interest owned by claimants in the patents) constitutes a capital asset within the meaning of I.R.C. Sec. 117 and any other applicable provisions of the Internal Revenue Code. The interests of claimants in the patents were not held by them primarily for sale to customers. If claimants' interest in the patents was used in their trade or business prior to the transfer and assignment of their interest therein, the patent payments are entitled to capital gain treatment by virtue of Sec. 117(j).
 
 
 29
 The 'sale or exchange' prerequisite for long term capital gain imposed by I.R.C. Sec. 117 is more than satisfied by the beforementioned transfer and assignment of all claimants' rights in the patents. Under such grant and transfer the grantee and assigns obtained the exclusive right to use, manufacture and sell under the patents for the life thereof, including the right to license and relicense. Claimants reserved no interest in the patents whatsoever, reversionary or otherwise, except the right to receive the consideration for the transfer and assignment of the patents.
 
 
 30
 Evidence in support of the facts set forth in this refund claim are contained in certain corporate and partnership minutes and agreements as augmented and supplemented by the actions of the parties confirmed by the records of Sawyer's Inc. and Western Photo Supply Co. Such evidence will be made available or be submitted to the Director of Internal Revenue or his representative upon request,
 
 
 31
 Since the patent payments were received by claimants as consideration for the sale or exchange of a capital asset held by claimants for more than six months the patent payments should be taxed as long term capital gain and not as ordinary income. Recomputation of claimants' 1950 income tax is set forth on the schedule hereto attached. In such recomputation one-half of the patent payments are included in adjusted gross income as long term capital gain which reduces adjusted gross income as reported in claimants' 1950 joint return by an amount equal to one-half of the patent payments. The difference between the recomputed tax and the tax reported in claimants' 1950 joint return is the amount of the refund claimed herein.
 
 
 
 [1]
 In 1944 the wives, Eva R. Mayer, Beulah F. Graves and Augusta Kelly (and her husband, Raymond F. Kelly) became partners. Pauline Meyer is a party to one of the five actions here consolidated. Her interest arises by reason of filing joint tax returns with her husband, Thomas O. Meyer
 
 
 [2]
 The tax problem here arises under Section 117 of the Internal Revenue Code of 1939, as amended, 26 U.S.C.A. 117
 
 
 [3]
 Many immaterial variations in the business arrangements as set forth in the contracts are ignored in the abbreviated references to the agreements as set forth in the opinion
 
 
 [4]
 The transfer to Western Photo was for the 'book value,' an amount not shown. But we take it from the record that the 'book value' was nominal
 
 
 [5]
 On this appeal, the existence of a capital asset and of the requisite time of holding are not questioned, only 'sale or exchange.'