**Mary Martha LEMOGE, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. C–71–1690–CBR.**

United States District Court, N. D. California.

Jan. 4, 1974

**230**

James S. Martin, Taylor & Martin, San Leandro, Cal., for plaintiff.

James L. Browning, Jr., U. S. Atty., Gary K. Shelton, Asst. U. S. Atty., San Francisco, Cal., for defendant.

## MEMORANDUM OF OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

RENFREW, District Judge.

Pursuant to stipulation, this case was submitted for decision upon an agreed statement of facts with attached documentary exhibits, the deposition of plaintiff, and the respective briefs of counsel.

Lemoge Electric, Inc., is a California corporation, incorporated in 1953. Plaintiff's husband had been president and sole shareholder of the corporation until his death in 1959. When her husband died, plaintiff became president and sole shareholder of the corporation.

In 1964 Lemoge Electric, Inc., was awarded a $579,647.01 subcontract to perform work on Mary's Help Hospital in Daly City. F. P. Lathrop, the general contractor, required Lemoge Electric, Inc., to secure a performance bond and a payment, labor and material bond, both of which were obtained from Argonaut Insurance Co. As a condition for obtaining the bonds plaintiff, individually, and Lemoge Electric, Inc., were required to indemnify the insurance company against any loss, damage or expense incurred as a result of the bond or in enforcing the indemnity agreement.

In 1964, Lemoge Electric, Inc., encountered financial difficulties on the Mary's Help Hospital subcontract and was unable to complete the subcontract with its own financial resources. Pursuant to the indemnity agreement with plaintiff, the Argonaut Insurance Co. declined to advance any funds to Lemoge Electric, Inc., to complete the subcontract until plaintiff had exhausted her personal assets. Accordingly, during 1965, plaintiff advanced the net sum of $66,972.65 from her personal assets to Lemoge Electric, Inc.

In June, 1966, plaintiff filed her 1965 individual income tax return and claimed a $42,172.65 [1] business bad debt deduction based on these unrecovered advances to the corporation.[2] She also requested and received with interest a refund of the tax withheld and estimated tax payments made in 1965, less $1,000 credited at plaintiff's request to her 1966 estimated tax.

In December, 1965, plaintiff filed an Application for Tentative Carryback Adjustment (Form 1045) in which she requested that her net operating loss for 1965 of $47,039.34 be carried back and applied against her taxable income for the years 1962, 1963 and 1964.[3] The ad-

---

1. Plaintiff's income tax return inexplicably claimed a deduction in the amount of $42,172.65 rather than the net amount of $66,972.65 actually advanced to the corporation.

2. Although the stipulated facts do not specifically indicate that plaintiff has never received any of these advances, the assertion in plaintiff's opening brief that she has not and will not receive any restitution "since the corporation has not had sufficient funds and has now been dissolved" (Plaintiff's Opening Brief, filed October 3, 1973, p. 2) has not been challenged by the government. Moreover, plaintiff testified in her deposition that she has not received any reimbursement from the corporation for these demands (Lemoge deposition, November 7, 1972, p. 25).

3. Plaintiff arrived at the $47,039.34 figure by subtracting $21,535.91, her gross business and nonbusiness income for 1965, from a

justment was allowed, and plaintiff received $12,924.13 in refunds of tax and interest for those years.

After conducting an audit, the Internal Revenue Service determined that plaintiff was not entitled to an ordinary loss deduction for the unrecovered advances made to Lemoge Electric, Inc., in 1965 nor to a net operating loss carryback and, therefore, assessed deficiencies totaling $20,999.14 for the years 1962, 1963, 1964 and 1965. The Internal Revenue Service did allow plaintiff a $1,000 nonbusiness bad debt deduction (short-term capital loss) with respect to the 1965 advances to the corporation.

Plaintiff paid the assessed deficiencies in 1970 and on January 13, 1971, filed refund claims (Forms 843) for 1965, asserting an ordinary loss deduction under 26 U.S.C. § 165 for losses in the form of unrecovered advances made to Lemoge Electric, Inc., in 1965 by reason of the indemnity agreement, and for the years 1962, 1963, and 1964 based on a net operating loss carryback to those years from 1965. By notices dated April 30, 1971, and sent by certified mail, plaintiff was informed that these refund claims had been disallowed in full. Thereafter, plaintiff filed this action.

The case presents three legal issues. First, whether the unrecovered advances to the corporation made by reason of the indemnity agreement were deductible under 26 U.S.C. § 165(c)(2), a transaction entered into for profit, and if so, whether the excess may be carried back to the years 1962, 1963 and 1964 under 26 U.S.C. § 172. Second, whether these advances were deductible under 26 U.S.C. § 166(a) and (d), as a business bad debt, and if so, whether the excess may be carried back as above. And third, whether the 1971 refund claim which requested a § 165 refund for 1965 precludes plaintiff, under 26 U.S.C. § 7422(a), from now asserting the § 166 business bad debt request for refund.

The instant action was timely filed. This Court has jurisdiction under 28 U.S.C. § 1346(a)(1), and venue is proper under 28 U.S.C. § 1402(a)(1).

It appears that the advances made by plaintiff are not deductible under 26 U.S.C. § 165(c)(2) but may be deductible under 26 U.S.C. § 166. Sections 165 and 166 are often confused on this issue. In Hoffman v. United States, 266 F.Supp. 884 (D.Or. 1967), a case quite similar to the one before this Court,[4] the court ruled that the loss sustained by reason of the indemnity contract was incurred in a transaction entered into for profit; although not connected with taxpayers' trade or business, and, therefore, that it was deductible under § 165(c)(2). The district court distinguished Putnam v. Commissioner of Internal Revenue, 352 U.S. 82, 77 S.Ct. 175, 1 L.Ed.2d 144 (1956), which held that an individual who guarantees an obligation of a corporation in which he holds stock is only entitled to a § 166 bad debt deduction, rather than an ordinary loss deduction under § 165(c)(2), since upon paying the creditor the stockholder is merely subrogated to the existing rights of the creditor against the corporation. "Unlike Putnam, the Hoffmans were indemnitors. An indemnitor has a primary obligation to the creditor and he is not subrogated to the creditors' rights. * * * Their [the Hoffmans'] loss cannot be treated as a worthless debt because the

---

claimed total 1965 business and nonbusiness deductible amount of $68,575.25, which included the full $66,972.65, which was the net amount advanced to the corporation in 1965, as well as various nonbusiness deductions claimed for that year. (See Exhibit J to Stipulation and Order for Presentation of Case.)

4. Unlike the Hoffmans, whose payments were made to the bonding company, plaintiff here advanced the money directly to Lemoge Electric, Inc. Since plaintiff's payments here were clearly made pursuant to her personal obligation under the indemnity agreement the fact that the payees are different is not sufficient to render *Hoffman* and the other authorities on this issue inapplicable to the instant case.

corporation owed them no debt." Hoffman v. United States, *supra,* 266 F. Supp. at 886.

■ The *Hoffman* case was reversed on that precise point three years later, United States v. Hoffman, 423 F.2d 1217 (9th Cir. 1970). Relying on the reasoning in Stratmore v. United States, 420 F.2d 461 (3rd Cir.), cert. denied, 398 U.S. 951, 90 S.Ct. 1870, 26 L.Ed.2d 291 (1970), the Court of Appeals rejected the distinction between guarantors and indemnitors drawn by the district court. The appellate court adopted the conclusion set forth in *Stratmore* that "the essence of Putnam v. Commissioner of Internal Revenue * * * was to protect the statutory scheme for a common tax treatment of all losses suffered by a corporate stockholder in providing his corporation with financing." United States v. Hoffman, *supra,* 423 F.2d at 1218. Such losses of stockholder-taxpayers were to be treated as capital losses under § 166(d), absent a showing that the debt was fully deductible as a business bad debt. To allow the tax result to turn on the technical subrogation rules of state law would undermine the uniformity which *Putnam* sought to achieve. Stratmore v. United States, 420 F.2d at 464–465; Martin v. Commissioner of Internal Revenue, 52 T.C. 140, 144–146 (1969), aff'd per curiam, 424 F.2d 1368 (9th Cir.), cert. denied, 400 U.S. 902, 91 S.Ct. 138, 27 L.Ed.2d 138 (1970). *Cf.* Stahl v. United States, 142 U.S.App.D.C. 309, 441 F.2d 999, 1002–1004 (1970). Therefore, plaintiff taxpayer, as a shareholder of Lemoge Electric, Inc., is not entitled to an ordinary loss deduction under § 165(c)(2) for the unrecovered advances made pursuant to the indemnity agreement, and the Court need not reach the question of loss carryback under this refund claim.

Plaintiff's second claim is that she is entitled to a business bad debt deduction under § 166(a) and (d) for the unrecovered advances to Lemoge Electric, Inc. Since this issue was not specifically raised in the 1971 claim for refund filed

with the Internal Revenue Service, the Government urges that 26 U.S.C. § 7422(a) and the accompanying regulations prohibit that ground for deduction from being raised now. Plaintiff argues that the variance prohibition may not now be invoked because it has been waived and because to do so would not be consistent with the purpose of the statute.

■ While strict compliance with the statute and regulations in issue here is usually required, it must be remembered that these provisions were "devised, not as traps for the unwary, but for the convenience of government officials in passing upon claims for refund and in preparing for trial. Failure to observe them does not necessarily preclude recovery." Tucker v. Alexander, 275 U.S. 228, 231, 48 S.Ct. 45, 46, 72 L. Ed. 253, 256 (1927). When applying this requirement to the specific facts of each case, the court must be mindful that the basic purposes of § 7422(a) and the accompanying regulations are "to afford the Service an opportunity to consider and dispose of the claim without the expense and time which would be consumed if every claim had to be litigated," Herrington v. United States, 416 F.2d 1029, 1032 (10th Cir. 1969), and "to prevent surprise on the facts," Mayer v. United States, 285 F.2d 683, 685 (9th Cir. 1960). Thus, the court can reach a decision on the merits if the refund claim presented "facts sufficient to enable the Commissioner of Internal Revenue to make an intelligent administrative review of the claim." Scovill Manufacturing Company v. Fitzpatrick, 215 F.2d 567, 569 (2nd Cir. 1954).

■ The facts of the transaction in question which were set forth in plaintiff's 1971 refund claim for 1965 (Exhibit N) differ in no material way from the stipulated facts on which this case has been submitted. Plaintiff's position as sole stockholder and president of Lemoge Electric, Inc., the personal indemnity agreement, and the cash advances, in specific amounts, made to the corporation pursuant to the indemnity

agreement are clearly presented in the 1971 refund claim. The instant case is unlike the situation in Miniature Vehicle Leasing Corp. v. United States, 266 F. Supp. 697 (D.N.J. 1967). There taxpayer's refund claim, asserting discriminatory taxation, did not apprise the Commissioner that taxpayer's automobile sales were on consignment or what the constructive price for tax purposes should be. The taxpayer attempted to assert these new facts in his suit for refund, but the court ruled that it was too late to claim for refund on the basis of those facts. Here, however, plaintiff's refund claim disclosed all of the facts relating to the transaction whether it was to be viewed in terms of § 165 or § 166. Moreover, the fact that at the outset plaintiff claimed a business bad debt deduction on her 1965 tax return and that the deficiency assessment of October 9, 1970, did allow a $1,000 nonbusiness bad debt deduction for 1965 indicates that the Service has at least had some opportunity to pass on the merits of the § 166 claim asserted in this suit.[5] Thus there has been no surprise on the facts and the goal of permitting administrative review before judicial action has in large part been fulfilled. *But cf.* Hempt Bros., Inc. v. United States, 354 F.Supp. 1172, 1182–1183 (M.D.Pa. 1973). "To sustain here the position of fatal variance between claim to director and claim in court would be to revive the evils of common law pleading." Mayer v. United States, *supra*, 285 F.2d at 686.

██ In addition, the government is estopped from raising the variance issue at so late a stage in these proceedings.

While the complaint herein does not mention a § 166 claim, defendant agreed at an early point in this litigation (Declaration of Plaintiff's Counsel filed May 4, 1972, and Certificate of Defendant's Counsel filed May 5, 1972) that the case would remain inactive pending the Supreme Court's decision in United States v. Generes, a case which only involved, both in the Court of Appeals, 427 F.2d 279 (5th Cir. 1970), and in the Supreme Court, 405 U.S. 93, 92 S.Ct. 827, 31 L. Ed.2d 62, rehearing denied, 405 U.S. 1033, 92 S.Ct. 1274, 31 L.Ed.2d 491 (1972), the proper standard to be applied in distinguishing business and nonbusiness bad debts under § 166(d). Moreover, defendant's pretrial statement clearly indicated that the government considered the application of § 166, as construed by the Supreme Court in United States v. Generes, to be one of the controlling points of law in this case. The variance issue did not appear in this litigation until the case was submitted on stipulated facts and briefs by the parties. Having helped to direct the litigation and the Court to the § 166 issue, the government cannot at such a late stage raise this claim of fatal variance.

Therefore, based on the lack of surprise, the absence of prejudice to administrative review, and the estoppel raised by the government's own conduct, plaintiff may assert the § 166 claim for a business bad debt deduction.

██ Turning now to the merits of plaintiff's claim for a deduction under § 166(a) and (d), it must be noted that deductions are a matter of legislative grace, and in order to obtain one, a taxpayer must bring himself within the ap-

---

5. Plaintiff has also argued that there has been a waiver of the requirements of § 7422(a) and the accompanying regulations. Since the grounds set forth above are sufficient to justify a consideration of the merits of the § 166 claim, a decision on the waiver issue is not necessary here. It appears, however, that since the formal requirements of the regulations serve to protect administrative review, "the showing should be unmistakable that the Commissioner has dispensed with his formal requirements and ex-

amined the merits of the claim asserted * * *." Herrington v. United States, *supra*, 416 F.2d at 1032. The fact that the Service did consider the bad debt deduction in the context of an audit of taxpayer's 1965 return does not, by itself, unmistakably indicate that the Commissioner has waived the requirements of the regulations as they apply in the context of a refund claim, especially since that claim was based almost entirely on § 165 and the district court decision in Hoffman v. United States *supra*.

propriate statutory authorization. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440, 54 S.Ct. 788, 790, 78 L.Ed. 1348, 1352 (1934). Moreover, a taxpayer has the burden of proving the Commissioner's determination to be incorrect with respect to whether a deduction may be taken. Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212, 215 (1933).

■■■■ The test used to determine whether a shareholder-employee of a corporation may deduct losses on an indemnity agreement is one of motivation. If the indemnification agreement was entered into to protect the shareholder's salary as an employee, a business bad debt deduction under § 166 will be allowed. On the other hand, if the motivation is to protect the corporation's profits and assets, the loss will be allowed only as a nonbusiness bad debt deduction. The Internal Revenue Regulations, 26 C.F.R. § 1.166–5(b), require that in order to qualify as a business bad debt, the loss resulting from the worthless debt have a "proximate" relation to taxpayer's trade or business, and the Supreme Court has recently held that the proper measure of the required proximate relation is one of "dominant motivation." United States v. Generes, supra, 405 U.S. at 103. Thus for plaintiff's loss to be fully deductible under § 166, she must show that her dominant motivation in executing the indemnification contract was to protect her salary as an employee of the corporation.

■■■■ While plaintiff testified that she agreed to indemnify the insurance company only to protect her salary, the record does not support the conclusion that this was her "dominant" motive. In Generes, the Supreme Court stressed that the "dominant motive" test permitted the trier of fact to "compare the risk against the potential reward and give proper emphasis to the objective rather than to the subjective." 405 U.S. at 104. The record here shows that plaintiff had a mixed motivation, and therefore she has not brought herself within the statutory requirements.

This conclusion is compelled because of the following facts. During the relevant period plaintiff's income was approximately $19,000 per year, approximately $13,000 of which was salary from the corporation. Her son-in-law also worked for the corporation and was paid approximately $16,000 per year. At her husband's death in 1959, his interest in the corporation, including plaintiff's community one-half, was valued at $315,404.71, and as late as August 31, 1964, the corporation still had a book net worth of approximately $200,000. The Mary's Help subcontract was the only occasion in which plaintiff personally was required to sign an indemnification agreement. The bonds posted by the insurance company were for over $800,000 in potential liability, and the plaintiff expected a contract profit of $57,964.70, or 10% of the total subcontract price.

From these facts it appears that the Mary's Help job was not essential for the corporation's continued existence or the maintenance of plaintiff's $13,000 per year salary. The project was unusual in that it was the only time plaintiff personally was required to execute an indemnification agreement, and the expected profit was over four times greater than plaintiff's annual corporate salary. It is unlikely that plaintiff would have risked all of her resources, as the indemnification contract required her to do before the insurance company would assume the obligation, to protect a $13,000 salary. When the anticipated $57,000 corporate profit is considered in light of plaintiff's ownership of all of the outstanding shares of the company, the maintenance of her annual salary cannot be said to be the dominant factor.

Protection of her son-in-law's job was another factor which makes it unlikely that maintenance of her salary was plaintiff's dominant motivation. If plaintiff had liquidated the corporation in 1964 when it was worth approximately $200,000, even a conservative investment would have yielded annual income in an amount approximating her salary,

but, of course, that alternative would have cost her son-in-law his job.

These considerations, based upon objective facts, all point to motives other than mere salary maintenance for keeping the corporation in operation and signing the indemnification contract. In fact, in Weddle v. C. I. R., 325 F.2d 849 (2nd Cir. 1963), which involved facts closely parallel to those of the instant case, the court affirmed a finding by the Tax Court that the taxpayer had failed to satisfy the then current "stringent" motivation test, a burden less stringent than that plaintiff must carry here.

Thus this Court finds that maintenance of her $13,000 salary was not plaintiff's dominant motivation for signing the indemnity agreement, and therefore the § 166 business bad debt deduction must be denied. As above, this conclusion obviates the question of a carryback of this loss.

The foregoing constitutes the Court's findings of fact and conclusions of law in accord with Rule 52(a) of the Federal Rules of Civil Procedure.

The parties are directed to prepare a judgment in accord with this opinion.