**W. R. ALSOBROOK and Wells F. Alsobrook, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. LR-74-C-171.

United States District Court, E. D. Arkansas, W. D.

April 7, 1977.

Robt. D. Cabe, Wright, Lindsey & Jennings, Little Rock, Ark., for plaintiffs.

W. H. Dillahunty, U. S. Atty., E. D. Ark., Little Rock, Ark., for the United States.

## MEMORANDUM AND ORDER

VAN SICKLE, District Judge.

This action is brought by taxpayers W. R. Alsobrook and Wells F. Alsobrook seeking refunds of income taxes previously assessed and paid. Jurisdiction is founded on 28 U.S.C. § 1346(a)(1) which provides for the bringing of a civil action to recover any internal revenue tax alleged to have been erroneously or illegally assessed or collected. The case has been submitted to the Court upon a stipulation of facts, depositions, exhibits and the respective briefs of counsel.

The present controversy concerns the tax consequences of payments made by the Plaintiff.[1]

W. R. Alsobrook made payments to the Benton State Bank in partial satisfaction of the Bank's capital impairment discovered in late 1967. The Plaintiff contends he is entitled to deductions against ordinary income for ordinary and necessary business expenses pursuant to 26 U.S.C. § 162; or for business losses pursuant to 26 U.S.C. § 165; or for business bad debts pursuant to 26 U.S.C. § 166. The United States resists these claims, contending that the Plaintiff's payments should be treated as capital contributions.

The Plaintiff was the prime organizer of the Benton State Bank in Benton, Arkansas, which was chartered in 1934. He has served as its President throughout its existence. At all pertinent times Mr. Alsobrook was Chairman of the Board of Directors; additionally, he and his wife owned 50.01 percent of the outstanding capital stock. For the years 1965 through 1967, Mr. Alsobrook's annual salary and yearly dividends from the Bank were as follows:

|  | SALARY | DIVIDENDS |
|---|---|---|
| 1965 | $10,450.00 | $18,230.24 |
| 1966 | $11,050.00 | $20,161.66 |
| 1967 | $11,050.00 | $20,152.66 |

Mr. Alsobrook personally established and implemented such policies and operating procedures as existed in the Bank. While the Bank had a Board of Directors, none of the members other than Mr. Alsobrook took an active part in the management of the Bank's affairs prior to November, 1967. Board membership was an honor bestowed by Mr. Alsobrook, and Board meetings amounted to little more than perfunctory gatherings in which management actions and decisions by Mr. Alsobrook were ratified. Until December 1, 1967, the Board had no loan committee, and Mr. Alsobrook personally supervised the loan officers and generally oversaw the loans made by the Bank with subsequent ratification by the Board.

In late October, 1967, an examination of the Bank was conducted, first by the Arkansas Bank Department and later by the Federal Deposit Insurance Corporation (FDIC). Investigation revealed that the Bank was holding a substantial quantity of questionable obligations amounting to a capital impairment of approximately $1,200,000.00.

The vast majority of the questionable loans involved Charles P. Ouletta, a substantial and active customer of the Bank for a number of years prior to November 16, 1967, who was in the construction business. Mr. Ouletta had regularly obtained and repaid loans and obtained financing for persons who had contracted with him for construction. Sometime in 1965, Mr. Ouletta began obtaining fraudulent loans from the Bank. The bulk of these loans were "secured" through the transfer of title to real property to a fictitious person or persons. Mr. Ouletta would then submit to the Bank a note and mortgage bearing the signatures of these fictitious persons. Because of his long established practice of arranging bona fide real estate loans, the Bank would accept the note and mortgage and transfer the funds to an account of Mr. Ouletta's for construction purposes. The loans were made without a bank officer or employee ever seeing the purported purchasers, and without appraisals of the land securing the loans.

While Mr. Alsobrook was generally responsible for the Bank's loan policies, he did not participate in the making of the fraudulent Ouletta loans. With but few isolated exceptions, all such loans were handled by William A. Springer, Executive Vice President of the Bank, who resigned December 31, 1967. Extensive investigation never revealed any evidence that anyone connected

---

1. Hereafter references to "the Plaintiff" will be to W. R. Alsobrook. His wife, Wells Also-brook, is a party to this action by reason of her status as a joint return taxpayer.

with the Bank knowingly accepted any of the forged Ouletta paper.[2]

The results of these investigations were not disclosed to officers and directors of the Bank until a special meeting of the Board called for 6:00 p.m., Thursday, November 16, 1967, at the direction of Harvel C. Adams, Commissioner of the Arkansas Bank Department. The Bank's officers and directors were given no advance notice as to the reason for the meeting. Ten of the twelve directors were present at the meeting together with the Commissioner, his examiners, staff members and legal counsel, and the FDIC examiners.

At the outset of the meeting, Commissioner Adams confronted the directors with the charge that the Bank had a capital impairment of $1,199,435.90, of which $1,032,546.07 was attributed to direct or indirect transactions involving Charles Ouletta. He further stated "in pretty harsh terms" (Adams Depo at 7, line 16) that steps had to be taken that night to satisfy the capital impairment, or he would not allow the Bank to open for business the next morning. The Commissioner's demands were non-negotiable and Mr. Alsobrook understood them as such.

The directors, including Fred E. Briner, the Bank's attorney, worked all through the night seeking a solution to the problem other than their paying large sums of money. Finally, voluntary contributions were made by several directors based on their ability to pay. The final commitments of the contributing directors as well as their respective share holdings were as follows:

| NAME | AMOUNT | NO. OF SHARES |
|---|---|---|
| W. R. Alsobrook | $1,045,000.00 | 11,195-11/12 |
| David Demuth | 100,000.00 | 21 |
| A. B. Holiman, Jr. | 20,000.00 | 232-2/3 |
| D. J. Stirman | 10,000.00 | 800 |
| W. A. Springer | 10,000.00 | 20 |
| Fred E. Briner | 10,000.00 | 105 |
| Russell Coleman | 5,000.00 | 20 |
| | $1,200,000.00 | |

The Commissioner required that each contributing director sign a written agreement as evidence of his commitment since cash could not be physically obtained and placed in the Bank before the opening for business on the following morning. These agreements were prepared by Harry E. Meek, counsel for the Arkansas Bank Department. The agreement executed by Mr. Alsobrook provided in part:

" . . . that as President and a Director of said bank he is obligated, jointly and severally with the other Directors, to discharge and satisfy the capital impairment above mentioned."

There are other indications that Mr. Alsobrook, Mr. Edward L. Wright, Commissioner Adams and Mr. Meek thought that Mr. Alsobrook might bear personal liability for the capital impairment.[3] However, on the night of November 16, 1967, this was not discussed. That night an unexpected emergency was being dealt with. At the time the main concern of everyone involved was to keep the Bank open by replacing the questionable loans with good money. Once the Bank was saved other concerns emerged and other details were worked out in the ensuing days and weeks.

Mr. Edward L. Wright, an attorney, was hired to assist Mr. Fred E. Briner to straighten out problems created by the capital impairment. The Bank's policies were revised so that a similar situation would not arise in the future, and plans were made for the handling of the classified loans. All of the classified loans which had contributed to the capital impairment were written down to the value of $1.00 on the Bank's books and the underlying notes, mortgages and chattel paper were transferred by the Bank to a trustee for the contributing di-

**2.** As a result of his fraudulent dealing with the Bank Mr. Ouletta was charged with forgery and uttering, convicted and sentenced to two ten-year concurrent terms. See, *Ouletta v. State*, 246 Ark. 1130, 442 S.W.2d 216 (1969); *Ouletta v. Sarver*, 307 F.Supp. 1099 (W.D. Ark.), Aff'd, 428 F.2d 804 (8th Cir. 1970).

**3.** "Now I can't defend in retrospect then or now, legally, the way it was all conducted and I think well, there could be a liability, probably was liability for failure, because there just were no policies written or actually implemented, it was a day to day, hour to hour country store operation." Deposition of Wright, p. 16.

rectors. Salvage efforts proceeded, and net proceeds were disbursed to the directors.[4] In essence, these loans were purchased by the directors; however, title to the loans remained in the Bank and no formal or written trust agreement between the Bank and the Directors was ever executed.

For the calendar year 1969, the Plaintiff claimed a deduction against ordinary income in the amount of $341,593.00. In choosing 1969 as the year in which he was entitled to a deduction Mr. Alsobrook relied heavily on the fact that this was when Charles Ouletta was convicted. See, n.2, *supra*. While Mr. Ouletta was named a defendant in the foreclosure actions by the Bank "no additional collection efforts were made against him" (Plaintiff's brief at p. 7).

The deduction was disallowed and a notice of deficiency was issued by the Internal Revenue Service. On or about February 19, 1974, the Plaintiff satisfied the deficiency with interest in the total sum of $142,-981.57. The Plaintiff then filed a timely claim for a refund which was subsequently disallowed by the Internal Revenue Service. The Plaintiff then instituted the present action seeking a refund of the amount of taxes and interest assessed against him.

■ Tax deductions do not turn on general equitable considerations, but are a matter of legislative grace. *Deputy v. DuPont*, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416 (1940). The burden is on the taxpayer asserting a claim for a deduction to prove that his claim fits clearly within the scope of a specific deduction section. See, *New Colonial Co. v. Helvering*, 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348 (1934); *Lemoge v. United States*, 378 F.Supp. 228, 233–34 (N.D.Cal.1974). In doing so, he must show that he has satisfied every requirement of the appropriate statute and its accompanying regulations.

The Plaintiff has failed in his burden of proof as to each of his claims for a deduction.

Section 162 of the Internal Revenue Code of 1954, as amended, 26 U.S.C. § 162, provides:

"There shall be allowed as a deduction *all the ordinary and necessary expenses paid or incurred during the taxable year* in carrying on any trade of business . .." (Emphasis added.)

■ Traditionally, voluntary payment of the debt of another has not been considered an ordinary and necessary business expense within the purview of Section 162. See: *Welch v. Helvering*, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933), and *Friedman v. Delaney*, 171 F.2d 269 (1st Cir. 1945). This Court recognizes, however, that this doctrine has suffered considerable erosion. A major exception has developed where payments made to protect and preserve an existing business reputation or good will are fully deductible as an ordinary and necessary business expense. *Allen v. C.I.R.*, 283 F.2d 785 (7th Cir. 1960); *Lutz v. C.I.R.*, 282 F.2d 614 (5th Cir. 1960); S. F. Tucker, *When Can a Taxpayer Deduct Expenses Made to Protect His Personal Business Reputation*, 39 J. Taxation 36 (July, 1973); but cf., *Fischer v. U.S.*, 490 F.2d 218 (7th Cir. 1973).

■ Notwithstanding, this Court is constrained to adopt and follow the traditional view, and I do hold that the payments made by the taxpayer are *not* "ordinary and necessary business expenses" as that phrase is used in Section 162.

Even if the Court were to reach a contrary result, the Plaintiff would fail in his claim based upon Section 162.

■ The mandate of the statute is clear. It allows deductions for expenses "paid or incurred during the taxable year". This expense was incurred on the night of November 16, 1967, when the Plaintiff committed himself to paying towards the replacement of the questionable bank loans. $705,000.00 of this expense was paid on November 16, 1967, and the rest was paid

4. TRUST ACCOUNT—1967–1976
   Disbursements to W. R. Alsobrook:

| Year | Amount |
|------|--------|
| 1967 | -0- |
| 1968 | 24,383.88 |
| 1969 | 79,023.53 |
| 1970 | 63,005.73 |
| 1971 | 11,838.96 |
| 1972 | 36,194.43 |
| 1973 | -0- |
| 1974 | 1,045.00 |
| 1975 | -0- |
| 1976 | -0- |

on December 12, 1967. As this expense was both incurred and paid in 1967, if it was deductible at all pursuant to § 162, 1967, not 1969, would have been the appropriate year. § 162 is meant to cover expenditures made within a given year which give rise to benefits within that year. It does not include expenses whose benefits are reaped over a period of years. The section is concerned with the immediate future and does not deal with losses over a period of time. Under § 162 an expense is properly recognized when the liability for it is incurred and/or when it is paid out. If later some of this money is recovered it is properly included in income. The Plaintiff's claim that his loss was deductible when he decided his chances for further reimbursement were remote is not properly cognizable under this section.

Turning to 28 U.S.C. § 165 and § 166; they will be discussed together.

5. "26 U.S.C. § 166. Bad Debts
   (a) *General rule.*—
   (1) *Wholly worthless debts.*—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.
   (2) *Partially worthless debts.*—When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.

   (d) *Nonbusiness debts.*—
   (1) *General rule.*—In the case of a taxpayer other than a corporation—
   (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and
   (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.
   (2) *Nonbusiness debt defined.*—For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than—
   (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or
   (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business."

6. See Regulations § 1.166–5 Nonbusiness debts "(b) *Nonbusiness debt defined.* For purposes of section 166 and this section, a nonbusiness debt is any debt other than—

In pertinent part, § 166 of the Internal Revenue Code of 1954, 26 U.S.C. § 166, provides that for a taxpayer other than a corporation, business bad debts may be deducted as ordinary losses.[5]

For a taxpayer to be entitled to a deduction for a business bad debt, *inter alia*, the loss from the worthlessness of the debt must be proximately related to the taxpayer's trade or business.[6]

Where an individual taxpayer works for a corporation, his business is not the same as that of the corporation. *Whipple v. Commissioner*, 373 U.S. 193, 83 S.Ct. 1168, 10 L.Ed.2d 288 (1963); *Dalton v. Bowers*, 287 U.S. 404, 53 S.Ct. 205, 77 L.Ed. 389 (1932). The taxpayer is in the business of being an employee. *United States v. Generes*, 405 U.S. 93, 92 S.Ct. 827, 31 L.Ed.2d 62 (1972). In the case of a shareholder-employee, as is the case with the Plaintiff

(1) A debt which is created, or acquired, in the course of a trade or business of the taxpayer, determined without regard to the relationship of the debt to a trade or business of the taxpayer at the time when the debt becomes worthless; or
(2) A debt, the loss from the worthlessness of which is incurred in the taxpayer's trade or business.
The question whether a debt is a nonbusiness debt is a question of fact in each particular case. The determination of whether the loss on a debt's becoming worthless has been incurred in a trade or business of the taxpayer shall, for this purpose, be made in substantially the same manner for determining whether a loss has been incurred in a trade or business for purposes of section 165(c)(1). For purposes of subparagraph (2) of this paragraph, the character of the debt is to be determined by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt comes within the exception provided by that subparagraph. The use to which the borrowed funds are put by the debtor is of no consequence in making a determination under this paragraph. For purposes of section 166 and this section, a nonbusiness debt does not include a debt described in section 165(g)(2)(C). See § 1.165–5, relating to losses on worthless securities."

here, the proximate relation of the debt to the taxpayer's business depends on whether the dominant motive in incurring it was that of protecting the taxpayer's employee status (his business interest) as opposed to his investment interest (a non-business interest for purposes of the statute). *Generes*, supra.

In *Generes* the Court decided that the dominant motivation of the president of a closely-held corporation for signing a blanket indemnity agreement with creditors of the corporation was not the protection of his $12,000.00 salary. The taxpayer owned 44% of the stock of the corporation; his original investment in the corporation was $38,900.00 and his total income was approximately $40,000.00 a year. The Court noted that with a dominant motivation standard the trier of fact could "give proper emphasis to the objective rather than to the subjective." *Generes*, supra, at 104, 92 S.Ct. at 833. It placed extreme emphasis on the different dollar amounts involved:

"What the taxpayer was purporting to say was that his $12,000 annual salary was his sole motivation, and that his $38,900 original investment, the actual value of which prior to the misfortunes of 1962 we do not know, plus his loans to the corporation, plus his personal interest in the integrity of the corporation as a source of living for his son-in-law and as an investment for his son and his other son-in-law, were of no consequence whatever in his thinking. . . . The $12,000 salary . . . would produce for him only about $7,000 net after federal tax . . . .. This is the figure . . . that has any possible significance for motivation purposes, and it is less than ⅕ of the original stock investment.

We conclude on these facts that the taxpayer's explanation falls of its own weight, and that reasonable minds could not ascribe, on this record, a dominant motivation directed to the preservation of the taxpayer's salary as president of Kelly-Generes Construction Co., Inc." *Generes*, supra, at 106–107, 92 S.Ct. at 834–835.

█ With its numerical comparisons *Generes* creates an almost impossible standard for a shareholder-employee to meet in claiming a business bad debt deduction.[7] Mr. Alsobrook cannot hope to satisfy this standard. At the end of 1967, disregarding the classified loans, the value of Mr. Alsobrook's bank stock was over $2,500,000.00. In 1965 through 1967, he received between $18,000.00 and $21,000.00 as yearly dividends on that stock. In those same years he received between $10,000.00 and $12,000.00 in salary from the Bank. Under these circumstances it would be hard to believe that Mr. Alsobrook's dominant motivation in purchasing the classified loans for $1,045,000.00 was the protection of his salary.

Even without these dollar comparisons, however, it would be hard to believe that Mr. Alsobrook's dominant motivation was the preservation of his employee status. It appears that his overriding concern was to keep the bank open and that this concern was multifaceted—it involved the welfare of the stockholders and depositors, the reputation of the bank, the continued existence of the bank he had created and cared for, his personal reputation, possible personal liability, etc. His attorney, Mr. Edward L. Wright, described him as a man of "impeccable" and "sensitive honor" (deposition of Mr. Wright, p. 15). Throughout the record, the picture emerges of an honorable gentle-

---

7. See: *Gantt v. United States*, 528 F.2d 354 (4th Cir. 1975); *Kelson v. United States*, 503 F.2d 1291 (10th Cir. 1974); *French v. United States*, 487 F.2d 1246 (1st Cir. 1973); *Estate of Byers v. C.I.R.*, 472 F.2d 590 (6th Cir. 1973); *Hogue v. C.I.R.*, 459 F.2d 932 (10th Cir. 1972); *Miles Production Company v. C.I.R.*, 457 F.2d 1150 (5th Cir. 1972); *Lemoge v. United States*, 378 F.Supp. 228 (N.D.Cal.1974); *Loventhal v. United States*, 346 F.Supp. 1318 (M.D.Tenn. 1972), aff'd 478 F.2d 311 (6th Cir. 1973); *R. A. Williams, Business v. Non-Business Bad Debts*, 22 Tulane Tax Inst. 333 (1973); Note, *Characterization of Shareholder-Creditor Bad Debt: United States v. Generes Sounds the Knell for Deductions from Ordinary Income*, 26 Vand.L. Rev. 105 (1973); J. S. Cohen, *Supreme Court Restricts Business Bad Debt Treatment of Stockholder-Corporate Loans*, 36 J. Taxation 194 (April, 1972).

man striving to save his bank with little or no concern for his investment. But, by the same token, his dominant motivation does not appear to be his employee status. Mr. Alsobrook is not entitled to a deduction pursuant to § 166.

 In pertinent part § 165 of the Internal Revenue Code of 1954, 26 U.S.C. § 165 provides for deductions for business losses.[8] The Plaintiff does not have a loss in the sense contemplated by this section. The plaintiff in essence replaced the classified loans in the bank and had a right to his pro rata share of the proceeds collectible from those loans. When he claimed a loss, he was claiming a loss due to the worthlessness of the debts.

The loss and the bad debt sections of the Code have long been considered mutually exclusive. *Putnam v. Commissioner,* 352 U.S. 82, 77 S.Ct. 175, 1 L.Ed.2d 144 (1956); *Spring City Co. v. Commissioner,* 292 U.S. 182, 189, 54 S.Ct. 644, 78 L.Ed. 1200 (1934); see *Horne v. C.I.R.,* 523 F.2d 1363 (9th Cir. 1975); *Stahl v. United States,* 142 U.S.App. D.C. 309, 441 F.2d 999 (1970); *Stratmore v. United States,* 420 F.2d 461 (3rd Cir. 1970). Plaintiff did in fact suffer his losses because he knowingly purchased a block of bad debts. Where the Plaintiff has been unable to meet his burden of proof that the debts were business bad debts, he cannot avoid the strictures of § 166 by claiming instead that they were business losses.

Moreover, even if we were to consider the Plaintiff's claims that he has sustained a business loss, we would again have to test it against a dominant motivation standard. See, *Generes,* supra, 405 U.S. at 105, 92 S.Ct. 827; *Imbesi v. C.I.R.,* 361 F.2d 640, 644 (3rd Cir. 1966); *Austin v. C.I.R.,* 298 F.2d 583, 584 (2nd Cir. 1962).[9] The Plaintiff is factually unable to meet that standard

for the reasons stated previously. He is not entitled to a deduction under Section 165.

As the Plaintiff has failed to show that he is entitled to a deduction under any of the sections claimed,

IT IS ORDERED, that his claim for a tax refund is *denied.* Counsel for the Defendant shall forthwith prepare and submit appropriate form of judgment in conformity herewith.

The foregoing memorandum and order constitutes compliance with Rule 52(a) of the Federal Rules of Civil Procedure.

---

8. "26 U.S.C. § 165. Losses

  *(a) General rule.*—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

  .  .  .  .  .

  *(c) Limitation on losses of individuals.*—In the case of an individual, the deduction under subsection (a) shall be limited to—

  (1) losses incurred in a trade or business;
  (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; . . .."

9. As noted by the Plaintiff "the same principles are applicable in determining whether a bad debt was incurred in a trade or business or whether a loss was incurred in a trade or business." See, note 6, supra.