ROBERT E. POMERANZ and ANNIE L. POMERANZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pomeranz v. Comm'r
Docket No. 3147-73. United States Tax Court
T.C. Memo 1980-36; 1980 Tax Ct. Memo LEXIS 552; 39 T.C.M. (CCH) 1010; T.C.M. (RIA) 80036; February 6, 1980, Filed *552 Philip B. Whiting, for the petitioners. Gary F. Walker, Paul J. Weiss, Jr., and Stephen L. Robbins, for the respondent. TANNENWALD
*553 MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined deficiencies in petitioners' income tax as follows: Year
Deficiency
1966
$29,414.48
1967
77,756.48
1968
45,411.00
1969
32,783.00
*554 These deficiencies arise from petitioners' deductions from income and the carryback of alleged net operating losses resulting from their purchase, pursuant to prior agreement, of corporate stock at a price greater than its market value. In addition, petitioners amended their petition to claim a refund of $38,846.41 for the taxable year 1968, based upon alleged net operating loss carrybacks from 1970 and 1971.
The issues for decision are: (1) whether and when petitioners sustained any recognizable loss within the meaning of sections 165 and 267 [1] with respect to the Clarkton Mills transaction; (2) the character and proper year of deduction of losses of petitioner Robert E. Pomeranz with respect to the Sparkle Mills transactions; (3) the character and proper year of deduction of losses of petitioner Robert E. Pomeranz from the Roxanne Mills transactions. GENERAL FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners were residents *555 of Sanford, N.C., on the date the petition herein was filed. They filed joint income tax returns on the cash basis for the taxable years 1966 through 1969 with the Director, Southeast Service Center, Chamblee, Ga. Their cash basis joint returns for 1970 and 1971, as well as their cash basis amended returns for those years, were filed with the Director, Internal Revenue Service Center, Memphis, Tenn.
Petitioner Robert E. Pomeranz (hereinafter Pomeranz) was educated and trained as a mechanical engineer. In 1946, he became the sole general partner, with an inactive limited partner, in a North Carolina limited partnership named Roberts Company, which manufactured parts for cotton-spinning frames. In 1953, the partnership purchased all the outstanding shares of the General Foundry and Machine Co., a North Carolina corporation which manufactured farm machines. The companies were combined into said corporation, which thereafter changed its name to Roberts Company (Roberts). Roberts expanded into modernizing and overhauling spinning frames and later began manufacturing spinning and twisting frames. It also became engaged in engineering and developing complete plans for new and rebuilt *556 spinning equipment, including study of work loads, floor layouts for yarn mills, and operating data. Roberts made its initial public offering of stock in 1957, but Pomeranz was still the majority shareholder in a fairly closely held situation. In 1964, the complexion of the board changed with the addition of Julius Abernathy. Abernathy, who became chairman of the executive committee, was responsible for the private placement of 230,000 shares of common stock and $5,000,000 in debentures of Roberts. This group of investors, represented on the board by Abernathy, had a financial interest in Roberts exceeding that of Pomeranz. Pomeranz, during the years in question, was in the trade or business of being a paid employee of Roberts. He served as its chairman, president, chief executive officer, and general manager. He was also its chief engineer and designer and played an important role in its sales efforts. Although there had been discussion by the board of hiring an additional executive to help run the company, Pomeranz' job was in no danger at any time during the period when the transactions involved herein took place. Nor did Pomeranz believe or have reason to believe that *557 any such danger existed during such periods. Pomeranz' salary and bonus compensation from Roberts during the years in issue were: Year
Compensation
1966
$53,625
1967
50,000
1968
48,000
1969
48,000
1970
16,500
In order to smooth out the cyclical sales pattern in textile machinery, Pomeranz conceived of the "turnkey" mill as a potentially profitable activity of Roberts and/ or its subsidiaries. A turnkey project was one in which all elements of a textile spinning mill were completed by Roberts or one of its subsidiaries. Roberts conducted feasibility studies and arranged for community grants, mortgage loans, and government financing. It also handled site selection, building design and construction, machinery selection and installation, selection and training of operating personnel, and establishment of production and quality standards. The concept envisioned that once the owner was given the key, he need only turn it and the mill would be ready to run.
Roberts was the first American textile machinery manufacturer to build entire mills in this fashion when it began to do so in 1960. At first, the mills were built for specific purchasers. In 1965, the first *558 mill was built on speculation, i.e., without a commitment by a purchaser to acquire the same, but a purchaser was found prior to the installation of the machinery. Following that period, however, several more mills, some speculative, were constructed due to Pomeranz' efforts. In part, the building of mills on speculation was designed to keep the unit cost of machinery down, so that, if and when the demand for Roberts' machinery declined, the company could continue to manufacture machines and install them in new, speculative turnkey projects. Roberts used two wholly owned subsidiaries in constructing and selling the turnkey mills. Roberts Engineers, Inc., acted as the project manager in designing and constructing the mills as well as supervising the plant start-up. Millcraft Corporation (Millcraft) arranged the financing for these plants and machinery. An attempt by Millcraft to go public in 1967 failed due to the small number of subscribers. Had it been successful, Millcraft would have taken over the turnkey mill development from Roberts. Pomeranz was neither an officer nor director of Millcraft. Roberts' published financial statements were on a considerated basis which included *559 its subsidiaries.
Until they could be sold, Millcraft controlled the operations of the speculative mills through wholly owned subsidiaries. Most members of Roberts' board of directors were continually concerned that operating these mills, and thereby competing with Roberts' customers, presented a conflict of interest. The board, therefore, was at all times desirous of having the speculative mills disposed of as promptly as possible. After experiencing fluctuating profits and losses from 1957 through 1963, Roberts showed rapidly increasing sales and profits in 1964, 1965, and 1966. [2] Sales slowed down in 1967, as Roberts was planning another public stock underwriting. In order to offset the sales decline, preserve Roberts' image as a growing company, and remove the company from being in competition with its customers, the board ordered Pomeranz to make sure Millcraft sold the two speculative turnkey mills which it then operated by the end of fiscal 1967 (December 2, 1967). Both mills were sold December 1, 1967, for approximately $5.7 million, contributing almost $1.3 million to profits for the year. *560 As of the end of each year indicated, the issued and outstanding common shares of Roberts and the number of shares owned by Pomeranz of record and beneficially were as follows: Total Roberts Co.
Roberts Co.
Year
Issued and Outstanding
Common Shares
End
Common Shares
Owned by Pomeranz
1966
1,052,177
285,466
1967
1,160,026
291,925
1968
1,460,026
273,525
1969
1,460,026
170,932
At least as of March 15, 1968, Pomeranz was deemed a "parent" of Roberts, within the meaning of the regulations of the Securities and Exchange Commission. The over-the-counter quotations for Roberts' shares at the dates indicated were as follows: Quarter Ending
Bid
Asked
4/1/68
15-3/4
16-1/4
7/1/68
23-1/4
23-3/4
9/30/68
20-7/8
21-3/8 12/31/68
24-3/8
24-7/8
4/1/69
15-3/4
16-1/4
6/30/69
12-3/8
12-3/4
9/30/69
9-1/4
9-3/4
12/31/69
6-1/2
7
3/31/70
3-5/8
4
6/30/70
1-7/8
2-1/8
9/30/70
1-1/4
1-5/8
12/30/70
Not Listed
3/31/71
Not Listed
6/30/71
Not Listed
9/30/71
Not Listed
12/31/71
Not Listed
During the periods indicated, Roberts paid dividends on its common stock as follows: Year
Cash
Stock
1957
$.21
1958
.10
8 percent
1959
1960
1961
10 percent
1962
1963
1964
1965
5 percent
1966
.20
25 percent
1967
.40
10 percent
1968
.30
1969
.10
5 percent
*561  Issue 1. Clarkton Mills
FINDINGS OF FACT Clarkton Mills, Inc. (Clarkton) had been incorporated in 1966 for the purpose of establishing an operating cotton yarn mill for sale or lease. Its certificate authorized 1,000 shares of common stock, of which only 200 were outstanding and owned by Millcraft in November 1967. At that time, the real and personal property utilized in operating the mill was owned by Millcraft and leased to Clarkton; there was a substantial mortgage indebtedness in the principal amount of $2,465,000 outstanding with respect to such mill. On November 20, 1967, Clarkton and T. J. Stevenson & Co. (Stevenson) executed a letter agreement whereby Stevenson would purchase the remaining 800 shares of Clarkton stock for $1 million. Stevenson also agreed to guarantee the aforesaid mortgage indebtedness, although, as between it and Millcraft, each would be liable only for its proportionate share in accordance with their stockholdings in Clarkton. As part of the transaction, Millcraft was to cancel its lease with Clarkton and convey the aforesaid real and personal property to Clarkton for $485,000 in cash and a $500,000 promissory note bearing interest at 63/4 percent with the principal payable in five equal annual installments, and the assumption by Clarkton of the aforesaid mortgage indebtedness. *562 At or about the time for the closing of this sale, on December 1, 1967, Stevenson refused to go through with the transaction without a guaranty. Stevenson was concerned with defects in the novel air flow system employed by the plant; not all of the "bugs" had been worked out of the system. Stevenson originally requested the right to resell Clarkton to Roberts if the mill did not work properly. Roberts rejected this arrangement because its auditors refused to permit it to treat the transaction as a sale for the purposes of its financial statements if it were so conditioned. Pomeranz offered to find a purchaser or personally purchase Stevenson's interest in Clarkton for $1.1 million within 90 days after notice from Stevenson given during the period June 1 through December 1, 1968. He did so against the advice of his attorney. With this assurance, formalized by a writing in which Pomeranz' wife joined, the transactions were completed on December 1, 1967. [3] Pomeranz did not inform the members of Roberts' board (other than those present at the December 1 closing) of this option until Stevenson exercised it.
At the time petitioners granted Stevenson this option, Pomeranz was certain the mill's problems would be corrected so that the option would not be exercised. Even were Stevenson to exercise the option, he anticipated either no problem in finding another purchaser or, as a last resort, that Roberts would reacquire the Stevenson shares of Clarkton.
The operations of the mill were unsuccessful. The defective air flow system, combined with machine deficiencies, created a serious quality problem. This hurt Clarkton's sales, as did having a selling agent unfamiliar with its products. Furthermore, the combed cotton yarn market experienced great difficulties in 1968. Stevenson informed petitioner in late 1968 that it intended to exercise its option. On November 21, 1968, the option period was extended to June 1, 1969. Stevenson gave the requisite notice of exercise of its option on February 25, 1969.
Pomeranz did not seriously try to find another purchaser because he felt that he could not, in good conscience, represent to anybody that Clarkton *563 was a viable business. After an unsuccessful attempt to get Roberts to purchase the Clarkton stock, petitioners were forced to personally purchase the shares from Stevenson on or about May 31, 1969. The purchase price of $913,500 [4]was less than the option price due to concessions by Stevenson in the amount of its income tax benefits from Clarkton's losses. Petitioners were unable to get Stevenson released from its guaranty of the mortgage indebtedness on the Clarkton property.
Cascade Company (Cascade) was incorporated in 1969 to pool the interests of a trustee of a trust for the benefit of the Pomeranz' children, Mrs. Pomeranz (as custodian for petitioners' six minor children) and Pomeranz. Of the 7,827 common shares issued and outstanding, Pomeranz owned 1,131 shares, four children each beneficially owned 1,208 shares, and two children each beneficially *564 owned 932 shares. Pomeranz at all pertinent times was president and a director of Cascade.
On May 31, 1969, Cascade purchased the remaining 200 shares of Clarkton from Millcraft for $202,000, the cost value of the stock on Millcraft's books.[5] On or about June 30, 1969, petitioners transferred their 800 shares of Clarkton stock to Cascade in return for Cascade's subordinated note for $213,000. Their accountant had determined that Clarkton had a possible future value of only $415,000, which consisted primarily of tax benefits. The purchase price of $213,000 was arrived at by simply subtracting the $202,000 which Cascade had paid Millcraft for the 200 shares of Clarkton from the $415,000 figure. On June 30, 1969, Cascade executed three notes $750totaling,000 to the Chase Manhattan Bank, Shapiro Factors Division (Shapiro). They were collateralized by 116,817 shares of petitioners' common stock of Roberts and guaranteed by petitioners *565 and Clarkton. Clarkton gave Cascade its note for the $750,000, which sum was then transferred by Shapiro to Clarkton. Clarkton then entered into a factoring agreement with Shapiro, which was guaranteed by Cascade.
Late in 1969, Stevenson received notice of Clarkton's default on its mortgage indebtedness. In February 1970, Roberts filed a petition under Chapter X of the Bankruptcy Act, leading to a sharp drop in the market price of its stock. On March 27, 1970, as a result of not having been released from its guaranty in respect of Clarkton's mortgage indebtedness, Stevenson purchased from Cascade all of Clarkton's stock and a promissory note of Clarkton in favor of Cascade in the face amount of $750,000 in return for $300,000 cash and petitioners' three notes in favor of Stevenson totaling $628,200. The cash was applied against the $750,000 Cascade notes to Chase Manhattan, as was $49,836.98 of the money in Clarkton's factoring account. Pomeranz gave notes for $400,163.02 to Chase Manhattan (covering the remaining balance of the original $750,000 Cascade notes) and for $15,036.98 to Cascade. In addition, Cascade's $213,000 note to him was marked paid. In return, Cascade marked *566 petitioners' $628,200 in notes, which it received from Stevenson, paid in full. Clarkton continued in business throughout the period June 1, 1969 to May 31, 1972. As of June 30, 1969, and March 27, 1970, it was a party to factoring agreements with Shapiro. Its audited financial statements [6] showed assets, liabilities, and stockholders' equity at the points of time indicated as follows:
5/31/69
5/31/70
5/31/71
5/31/72
[7] Assets Current assets
$ 882,844
$ 635,407
$ 500,555
$ 346,918
Property, plant, and
equipment (at cost
less depreciation)
3,153,023
2,988,814
2,901,064
2,684,936
Start-up costs (net
of accumulated
amortization)
15,068
10,763
6,458
Total
$4,050,935
$3,634,984
$3,408,077
$3,031,854
Liabilities
Current liabilities
$ 569,508
$ 576,764
$ 770,488
$1,105,571
Long-term debt
3,260,516
2,570,038
2,601,475
2,334,032
Deferred income taxes
137,000
126,600
116,200
Stockholders' equity
83,911
361,582
(80,086)
(407,749)
Total
$4,050,935
$3,634,984
$3,408,077
$3,031,854
*567 Such audited financial statements showed net sales and net losses of Clarkton for the fiscal years ending on the dates indicated as follows: 5/31/69
5/31/70
5/31/71
5/31/72
Net sales
$2,048,293
$2,034,073
$3,812,350
$4,331,227
Net loss
(956,242)
(627,012)
(441,669)
(327,662)
Petitioners filed their Federal income tax return for 1969 on April 15, 1970. They claimed an ordinary loss of $700,500 for "Payment under guarantee to T. J. Stevenson and Co." They also filed Form 1045 claiming tentative refunds from the carryback of this loss to taxable years 1966, 1967, and 1968 in the amounts of $29,414, $77,756, and $45,411, respectively. These refunds were allowed and are the basis of the deficiencies asserted herein for those years. On their 1970 return, petitioners did not claim any loss in respect of the Clarkton transactions. They filed an amended return for 1970 on June 18, 1973, in which they again deducted the $700,500 as an ordinary loss. This was done to protect themselves in case 1970 rather than 1969 was the proper year for deducting *568 part or all of the loss.
OPINION Petitioners contend that an ordinary loss of $700,500 was incurred in Pomeranz' trade or business in 1969 from their purchase and/or subsequent disposition of the Clarkton stock. They claim that the Clarkton stock was worthless when they were forced to repurchase it pursuant to their agreement with Stevenson, which resulted in a loss at that time equal to the purchase price of $913,500. This loss was then offset by a $213,000 ordinary gain when they sold the 800 shares to Cascade, netting out to the $700,500 loss claimed on their 1969 return. Petitioners, recognizing that they are cash basis taxpayers, argue, in the alternative, that they may be entitled to deduct only $300,000 of the loss in 1969, i.e., the portion paid in cash, and the remaining $400,500 in 1970, when the notes covering the balance were allegedly paid and cancelled. Petitioners further argue that, even if the losses were not incurred in Pomeranz' trade or business, they are, in any event, entitled to a capital loss or losses in the amounts claimed under sections 165(f) or (g), 172(d) (4), 1211, and 1212. Respondent replies, first, that the Clarkton stock was not worthless *569 when petitioners acquired it, so that no loss can be recognized at that time, even if the purchase price was greater than its value. Since petitioners then sold it to a related corporation, he explains, they cannot recognize the loss due to the provisions of section 267. Respondent also argues that Pomeranz did not offer the Stevenson option, and therefore did not incur the loss, in connection with his trade or business, as that term has been defined in the case law. Finally, he argues that no losses were suffered by petitioners in the Clarkton stock purchase because their cash and notes were returned in exchange for the stock in 1970. We agree with respondent that petitioners are not entitled to deduct their losses incurred in the Clarkton transaction. Both parties agree that as of May 31, 1969, when petitioners purchased the Clarkton stock from Stevenson, the option price exceeded its fair market value, if any. Both parties also treat the acquisition from Stevenson and the subsequent sale to Cascade as separate transactions. The difference between the parties hinges on the question whether the Clarkton stock had any value at the time of acquisition. If it did not, petitioners *570 might well be correct that there were two taxable events, i.e., a deduction for worthless stock and a gain from the sale of Cascade. Cf. Mitchell v. Commissioner, 187 F.2d 706 (2d Cir. 1951), revg. and remanding 13 T.C. 368 (1949). [8] On the other hand, if the stock still had value as of that date, petitioners are not entitled to any deduction on account of its purchase. Cf. Grigsby v. Commissioner, 87 F.2d 96 (7th Cir. 1937), affg. 33 B.T.A. 568 (1935); T. H. Symington & Son, Inc. V. Commissioner, 35 B.T.A. 711 (1937). Under such circumstances, the taxable event is the disposition of the stock. Grigsby v. Commissioner, supra at 97; sec. 1.165-4(a), Income Tax Regs.
Thus, the threshhold question is whether the Clarkton stock was worthless when it was purchased by petitioners. The burden of proof is on them. Boehm v. Commissioner, 326 U.S. 287 (1945). The standards for a determination of worthlessness were set forth in Morton v. Commissioner, 38 B.T.A. 1270, 1278-1279 (1938), *571 affd. 112 F.2d 320 (7th Cir. 1940): The ultimate value of stock, and conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and can not be said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation. As of the date of sale, Clarkton's assets exceeded its liabilities. Its audited financial statement showed stockholders' equity of $83,911 as of May 31, 1969. We have further noted two unaudited statements which reveal stockholders' equity of $5,123.03 (as of April 30, 1969) *572 and $165,503 (as of May 31, 1969). See footnote 6, supra. See also footnote 7. Pomeranz' belief that the stock was worthless is simply insufficient to overcome such evidence. Bryan v. Commissioner, 281 F.2d 238, 243 (4th Cir. 1960), affg. on this issue 32 T.C. 104 (1959); Aagaard v. Commissioner, 56 T.C. 191, 209 (1971). Cf. United States v. Generes, 405 U.S. 93, 106 (1972). With respect to "potential value," Pomeranz acknowledged that, while he did not attempt to find another purchaser of Clarkton immediately, he had planned to do so in the future. The air flow system had been corrected and he believed he could turn the mill's fortunes around and resell it in the future. Clearly, he was not "prepared to throw in the sponge." See Bullard v. United States, 146 F.2d 386, 388 (2d Cir. 1944). In fact, Pomeranz continued operating the mill, investing additional operating funds. While the continued operation of a corporation does not of itself prove value in its stock ( Steadman v. Commissioner, 50 T.C. 369, 378 (1968), affd. 424 F.2d 1 (6th Cir. 1970); Rand v. Commissioner, 40 B.T.A. 233, 240 (1939), *573 affd. 116 F.2d 929 (8th Cir. 1941)), it is certainly a significant factor. Cf. Bullard v. United States, supra.[9] In sum, we hold that petitioners have failed to carry their burden of proof that the Clarkton stock was worthless at the time they acquired it from Stevenson. Petitioners sold the Clarkton stock to Cascade a month later, on June 30, 1969, for $213,000. Had Cascade been unrelated to petitioners, this would have been an event triggering recognition of their loss. Section 267, however, intercedes. It provides: (a) Deductions Disallowed. -- No deduction shall be allowed -- (1) Losses. - In respect of losses from sales or exchanges of property * * *, directly or indirectly, between persons specified within any one of the paragraphs of subsection (b). * * *
(b) Relationships. -- The persons referred to in subsection (a) are: * * *
(2) An individual and a corporation more than 50 percent in value *574 of the outstanding stock of which is owned, directly or indirectly, by or for such individual; * * *
(c) Constructive Ownership of Stock. -- For purposes of determining, in applying subsection (b), the ownership of stock -- (1) Stock owned, directly or indirectly, by * * * a * * * trust shall be considered as being owned proportionately by or for its * * * beneficiaries; (2) An individual shall be considered as owning the stock owned, directly or indirectly, by or for his family; * * *
(4) The family of an individual shall include only his brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants * * *. * * *
Applying the constructive ownership provisions of section 267(c), both of the petitioners are deemed to own all of the stock of Cascade. The shares owned by the family trust and by Mrs. Pomeranz as custodian are considered to be owned by their beneficiaries, the children, and are then attributed to the parents. Section 1.267(c)-1, Income Tax Regs. Thus, petitioners are not entitled to deduct their loss from the sale to Cascade because it was to a corporation in which they owned more than 50 percent of the value *575 of the outstanding stock. Moreover, petitioners can claim no deduction on Stevenson's repurchase of the Clarkton stock in 1970, if a loss was then suffered, because they no longer owned the stock. Any such loss was that of Cascade. In view of the foregoing conclusions, we find it unnecessary to deal with the question whether petitioners' claimed loss in respect of the Clarkton stock might be treated as an ordinary loss incurred in connection with Pomeranz' business, although we are constrained to note that our reasoning in this regard with respect to the so-called Sparkle losses (Issue 2, infra) would appear to be equally applicable to the instant issue. We hold that petitioners are not entitled to any deduction in 1969 or 1970 with respect to their purchase and sale of Clarkton stock. Issue 2. Sparkle Mills
FINDINGS OF FACT A further turnkey project was initiated on January 19, 1968, pursuant to an agreement between Roberts Engineers, Inc., and Martin Green, president of Sparkle Mills, Inc. (Sparkle). Green was also mayor of Olanta, S.C., which is where Sparkle was to be located. The Olanta Industrial Board, Inc., was to construct the building with the aid *576 of Small Business Administration (SBA) financing. Pomeranz was interested in arranging for the construction of a midfiber system mill because Roberts had some of the machinery available in inventory and a turnkey project using this system had not been constructed. Sparkle was to have starting capital of $600,000. The local people in Olanta were to secure stock subscriptions covering $400,000 and Roberts and its subsidiaries would arrange for the remainder. Problems soon arose. The local group, headed by Green, was able to secure only $250,000 in Sparkle stock subscriptions. The SBA limited Millcraft's participation to 15 percent ($90,000) of the Sparkle shares. Around September 1968, due to Green's efforts, Sparkle and Roberts agreed to change the mill, still in construction, to carpet yarn production rather than a midfiber system. As a result, two major investors, who had subscribed for a total of $235,000 of the shares, withdrew. Pomeranz and Huffines (who had been a member of Roberts' board and, at an undeterminable time between September 1968 and August 1969, became president of Sparkle) then sought new investors. Pomeranz contacted Paul Sloan (Sloan), who agreed to purchase *577 at least 95 shares provided petitioner would help him finance it. Pomeranz delivered to Sloan a check for $20,000 on November 12, 1968, and one for $75,000 on December 6, 1968, the latter in exchange for Sloan's note in that amount. [10]The note was secured by a pledge of 75 shares of Sparkle stock. Huffines paid Pomeranz $37,500 for a proportionate part of the Sloan subscription and Sloan was credited with the payment vis-a-vis Pomeranz. Pomeranz and Sloan agreed that Sloan would not be required to repay $57the,500 balance; instead, he could assign the pledged shares to Pomeranz as payment. Pomeranz (and, through him, Huffines) was also given the right for one year, beginning February 18, 1969, to acquire the 75 shares from Sloan at 105 percent of cost, any payment in respect thereto to be applied to Sloan's indebtedness.
*578 Huffines contacted Richard Jeffries, Jr., who agreed to subscribe to 80 shares for $80,000 provided Pomeranz and Huffines would guaranty a $60,000 bank loan by Jeffries for that portion of the purchase price. Pomeranz and Huffines each guaranteed $30,000 of the loan. When the note came due, Pomeranz paid $12,500.00 in 1970, $1,707.00 in 1971, $17and,934.55 in 1972, including accrued interest. Jeffries was not expected to repay Pomeranz if the project was unsuccessful; he could liquidate his obligation by assigning 30 shares to Pomeranz. [11]
Green became dissatisfied because his local group held a minority interest of only 251 shares of Sparkle. He arranged to purchase 65 additional shares from other parties at a 10-percent profit in order to gain a controlling interest. These shares, however, were restricted and could not be transferred to his voting control. Green initiated a lawsuit to acquire this control. On September 30, 1969, prior to the issuance of a decision by the local court, Pomeranz purchased the 316 shares held by Green's group *579 for $395,000, representing a 25-percent profit. He delivered a $395,000 note due January 1, 1970, and secured by an escrow arrangement. Pomeranz paid the note on January 1, 1970.
Roberts' subsequent reorganization under Chapter X contributed to problems between Sparkle and its factor, which also held a mortgage on some of its property. In 1971, the mortgages on Sparkle were foreclosed and it ceased operations. On their 1971 tax return, petitioners claimed a long-term capital loss deduction for $482,500 under the caption "Worthless stock–Sparkle Mills." They now claim such loss is ordinary in the sum of $483,500. [12]
OPINION On their 1971 tax return, petitioners deducted their losses in connection with the Sparkle Mills transactions as capital losses for worthless stock. *580 They now claim that these losses, resulting from the moneys invested through or paid to Paul Sloan, Richard Jeffries, Jr., and the Green group, were ordinary losses incurred either in Pomeranz' trade or business (section 165 (c)(1)), in transactions entered into for profit (section 165(c)(2)), or as business bad debts (section 166(a)). Respondent contends that these losses were properly characterized on petitioners' return as worthless securities, deductible as capital losses pursuant to section 165(g). Neither the amounts of the losses nor the proper year of deduction are in dispute. Whether petitioners are entitled to a deduction in respect of the Sparkle transactions as losses incurred in a trade or business under section 165(c)(1) or in a "transaction entered into for profit" under section 165(c)(2), or as a business bad debt under section 166(a), the critical question is what was Pomeranz' "dominant motivation" in participating in such transactions. United States v. Generes, 405 U.S. 93, 105 (1972), and cases cited thereat; Alsobrook v. United States, 431 F. Supp. 1122, 1129 (E.D. Ark. 1977), affd. per curiam 566 F.2d 628 (8th Cir. 1977). *581 [13] Petitioners contend that Pomeranz' dominant motive in advancing the funds in connection with the Sparkle transactions "was to protect and secure his employment at [Roberts], where Trunkey Mills were his special responsibility." The evidence indicates otherwise. Pomeranz did not act to protect his job. There is no evidence that his job was ever in danger, nor do we believe that he ever thought or had reason to believe that it was in danger. To be sure, there was talk of bringing a new executive into the company to help run it and free Pomeranz to design new machinery and mills, but Pomeranz himself was involved in searching for the executive, and bringing in such an executive in no way threatened his position. Moreover, when Pomeranz convinced the board that Roberts could not afford another executive, the search was dropped. *582 We are satisfied that Pomeranz' dominant motive in making these advances was similar to that which existed in Shinefeld v. Commissioner,65 T.C. 1092 (1976). In that case, the taxpayer acted for the corporation (Multipane) which he had founded and later sold but continued operating. We found that he regarded Multipane as his baby and that his dominant motive in advancing funds was "to protect Multipane itself" and that other considerations such as the taxpayer's "status, reputation, and image to the trade" were not so endangered as to enable him to satisfy the dominant motivation standard. See 65 T.C. at 1099. In the instant case, Pomeranz sought to protect and enhance the business and reputation of Roberts. Roberts was his baby just as Multipane was Shinefeld's. As Roberts' counsel testified, Pomeranz considered Roberts not in the plural but in the possessive sense: "The apostrophe was not there but it was his company." He advanced funds to or through Sloan and Jeffries in order to facilitate the continued growth of Roberts' turnkey mill building program. He bought out the Green group to prevent what otherwise could have destroyed Sparkle's and *583 therefore Roberts' prospects; so long as Green was in the picture, Sparkle's management would be uncertain and potential customers frightened. Moreover, we note that in Shinefeld the taxpayer was not a shareholder of Multipane at the time of the transactions involved therein, while in this case Pomeranz and his family had a substantial shareholder position in Roberts. While this factor is of lesser importance than the various other elements bearing on "dominant motivation" contained in the record herein, it is a further indication of the capital rather than trade or business character of Pomeranz' involvement in the Sparkle transactions. [14]
*584 The long and the short of the matter is that the real basis of petitioners' position is that Roberts' business was Pomeranz' business. But it has long been settled that a taxpayer may not prevail on any such theory because the trade or business of a corporation is separate from that of its employees. Deputy v. du Pont, 308 U.S. 488, 494 (1940); cf. Shinefeldv. Commissioner, supra; Imel v. Commissioner,61 T.C. 318 (1973). Nor do petitioners meet the requisite standard for an ordinary loss deduction incurred in a "transaction entered into for profit" as provided in section 165(c)(2). While we believe that Pomeranz hoped, and may well have expected, that the Sparkle transactions would be profitable, that was not his primary (or dominant) [15] motive for acting; his efforts to make Sparkle a profitable operation were designed to benefit Roberts and only indirectly himself. Cf. Austin v.Commissioner, 298 F.2d 583 (2d Cir. 1962), affg. 35 T.C. 221 (1960); Ewing v. Commissioner, 20 T.C. 216, 233 (1953), affd. 213 F.2d 438 (2d Cir. 1954). As far as the Green *585 shares are concerned, Pomeranz purchased such shares in order to settle Green's suit for control of Sparkle and to be in a position to operate the plant as he wished. Furthermore, he purchased the shares himself only when he could not find another buyer. As far as the dealings with Sloan and Jeffries are concerned, Pomeranz' primary motive for advancing the funds was to insure that Sparkle would have its initial capital subscribed to and paid for. We are satisfied, as we were in Shinefeld, that, with respect to the Sparkle transactions, any motivations of Pomeranz which were rooted in protection of his compensation from Roberts or his own status, reputation and image to the trade were purely incidental to his dominant motivation to protect *586 and enhance the business and reputation of Roberts. As a consequence, any losses which he sustained are capital losses resulting from securities which became worthless in 1971. In this connection, we note that, although petitioners have advanced the position that they are entitled to business bad debt deductions under section 166(d), they have concentrated their argument in this regard on the "business" rather than "bad debt" aspects of the transaction; they have made no claim for nonbusiness bad debt treatment (which would entitle them to short-term as distinguished from long-term capital losses. See section 166(d)(1)(B)). We believe that, under the totality of the circumstances, there are serious problems in constructing a "bad debt" foundation for Pomeranz' advances and payments to Sloan, Jeffries, and the Green group, but, in view of our conclusion on the "business" aspect of section 166 and petitioners' failure to advance any claim for a "nonbusiness" deduction, we hold that the capital loss treatment for worthless stock accorded these transactions on petitioners' 1971 return and allowed by respondent is the proper disposition of the Sparkle issue. Issue 3. Roxanne Mills
*587 FINDINGS OF FACT As a result of the change in plans for Sparkle, Roberts had machinery for an entire turnkey mill using the midfiber system in inventory. Roberts also owned a 50-acre tract of land in Sanford, N. C., and needed the additional business. Pomeranz arranged for financing a building using the original Sparkle floor plan to employ this machinery and obtained the reluctant approval of Roberts' board to proceed. A limited partnership, Marathon Company (Marathon), was to be formed with $800,000 capital. Millcraft was to be its sole general partner and would invest $160,000. Marathon would own 100 percent of the shares of the operating company, Roxanne Mills, Inc. (Roxanne), into which most of the initial capital would flow. Once 20 percent of its subscribed initial capital was paid for, Roberts' auditors would treat Marathon as an active business, and thereby recognize sales of machinery to it.
The partnership was organized, after difficulties in finding investors, on November 29, 1968. Pomeranz arranged with Paul Sloan for the organization of Dillon Associates, Inc. (Dillon), to subscribe to a limited partnership interest of $80,000 in Marathon. He delivered to *588 Sloan a check for $17,000 on November 26, 1968, in exchange for Sloan's note, to cover Roxanne's organization expenses and 20 percent of its subscription. The note was secured by 17 shares of Dillon stock. Pomeranz issued a $64,000 check to Dillon on April 25, 1969, to cover the remainder of Dillon's subscription. [16] Pomeranz and Sloan agreed that Sloan would not be required to repay these sums and could assign the pledged shares to Pomeranz as payment of the debt. Pomeranz was also given the right for three years, beginning November 26, 1968, to acquire the 17 shares from Sloan at 105 percent of cost, any payment in respect thereto to be applied to Sloan's indebtedness. Pomeranz was repaid $585.73 which was not needed. Petitioner also arranged with George Baron, Roberts' securities attorney, to subscribe to an $80,000 interest in Marathon. Baron agreed to pay only the initial $16,000 out of his own funds. Petitioner purchased the *589 remainder of the subscription for his own account, paying $64,000 to Marathon on April 25, 1969. Finally, Pomeranz arranged with Aaron Ribakove for the organization of Rondo Company (Rondo), a Delaware corporation, to subscribe to a limited partnership interest. Rondo subscribed to $320,000, with Pomeranz advancing $138,000 to Ribakove on April 25, 1969. Pomeranz was repaid $16,000 and received Ribakove's note for the remaining $122,000. The note was collateralized with Rondo shares which Pomeranz and Ribakove agreed could be used to satisfy the amount of the note. Ribakove also gave Pomeranz a one-year option from April 25, 1969 to purchase the Rondo shares securing the note for 105 percent of cost, any payment in respect thereto to be applied to Ribakove's indebtedess to Pomeranz.
In 1971, the mortgages on Roxanne's properties were foreclosed and it ceased operations. On their original 1971 return, petitioners claimed capital losses of $80,414.27 from the Dillon transaction as "Worthless stock - Dillon Associates" and $232,000 in respect of the Ribakove and Baron transactions as "Worthless stock - Rondo Co." On their amended 1971 return, they changed these claims from *590 capital losses to ordinary losses on the ground that they were business related to Pomeranz' employment with Roberts. Petitioners now concede that the amount of the claimed Baron and Rondo losses does not exceed $186,000.
OPINION Although differing in detail, the factual foundations for decision of the issues relating to the Roxanne transactions are substantially the same as those involved in the Sparkle transactions (Issue 2). We see no reason to repeat our analysis of the latter which has been set forth in the opinion portion relating to that issue. For the same reason set forth in that analysis, including our serious doubts as to whether any "debts" are involved, we conclude that petitioners' losses from the Roxanne transactions are capital losses in 1971 resulting from worthless stock. [17]
*591 Decision will be entered for the respondent.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in question.↩
2. ↩
Fiscal year
Sales
Net income (Loss)
ending
(in thousands)
(in thousands)
1963
$ 8,383
$ (712)
1964
15,327
710
1965
20,603
1,286
1966
31,549
1,990
1967
31,552
1,557
1968
28,983
475
3. In November 1967, the second speculative mill was sold to another purchaser, but that transaction is not involved herein.↩
4. Petitioners delivered to Stevenson a certified check for $300,000 and joint promissory notes for $200,000 and $413,500, collateralized by 65,900 shares of Roberts' stock. Petitioners later gave an additional note for $14,700 as an adjustment to avoid New York usury laws, resulting in a purchase price of $928,200.↩
5. Millcraft had written up its initial $10,000 cost in Clarkton stock to $202,000 when Stevenson first purchased the 800 shares for $1,000,000, in order to reflect its 20-percent interest in the $1,010,000 of capital stock and paid-in surplus.↩
6. An unaudited statement with comparable items showed stockholders' equity at $5,123.03 as of April 30, 1969. An internal analysis prepared by petitioners' accountant, at or about the time of the reacquisition of the Clarkton shares by petitioners from Stevenson, showed such equity at $165,503.↩
7. The record does not contain any evidence as to the fair market value of any of the assets.↩
8. See also IDI Management, Inc. v. Commissioner, T. C. Memo. 1977-369↩.
9. See also Thun v. Commissioner, T.C. Memo. 1977-372; Ryan v. Commissioner, T.C. Memo. 1956-169; Hulbert v. Commissioner↩, a Memorandum Opinion of this Court dated Dec. 30, 1953.
10. Given the similarity of the transaction involving the $20,000 with other advances from Pomeranz to Sloan and others, we presume that Sloan gave his note for this sum as well, which was similarly collateralized. However, no such note is in evidence. A total of $115,000 of Sparkle stock was purchased in Sloan's name. Apparently, he invested $20,000 of his own funds in addition to the funds advanced by Pomeranz.↩
11. The record does not disclose any right of acquisition in Pomeranz (or Huffines) as existed in the situation vis-a-vis Sloan.↩
12. The difference in total is attributable to petitioners now claiming a loss of $31,000 in the Jeffries guaranty, rather than the $30,000 previously claimed. The amount of the claimed loss is computed as follows: ↩
Paul Sloan
$95,000
Less Repayment
37,500
$57,500
Martin Green, Trustee
395,000
Richard Jeffries
12,500
Richard Jeffries
18,500
31,000
$483,500
13. Respondent has conceded that, insofar as the instant case is concerned, the substantial investment motivation test of W. W. Windle Co. v. Commissioner, 65 T.C. 694 (1976), appeal dismissed for lack of jurisdiction 550 F.2d 43 (1st Cir. 1977), should not be applied. See Rev. Rul. 78-94, 1978-1 C.B. 58↩.
14. In this connection, we see no point in elaborating on the comparative mathematical variations in the investment versus salary rations in Generes, Shinefeld, and the instant case. As we pointed out in Shinefeld, they are not conclusive (see 65 T.C. at 1099, n. 13; see also Alsobrook v. United States, 431 F. Supp. 1122, 1128 (E.D. Ark. 1977), affd. per curiam 566 F.2d 628↩ (8th Cir. 1977)), and, in any event, any such comparison would militate against the petitioners' position herein.
15. In the context of situations such as are involved herein, we perceive no difference between "primary" and "dominant" purpose. See also United States v.Generes, 405 U.S. 93, 105 (1972), wherein the Supreme Court, in articulating the "dominant motivation" test, cites Austin v. Commissioner, 298 F.2d 583 (2d Cir. 1962), affg. 35 T.C. 221↩ (1960), in which the word "primary" is used.
16. As in the case of Pomeranz' arrangement with Sloan in respect of Sparkle (see footnote 10, supra↩), we assume that a collateralized note for this amount was given by Sloan and/or Dillon to Pomeranz, although no such note is in evidence.
17. As in the Sparkle situation, neither the amount of the losses nor the year of deduction are in issue. In this regard, we note that respondent asserts no additional deficiency resulting from petitioners' conceded reduction in claimed loss from the Baron and Rondo advances, probably because of petitioners' negative income for the year. Thus, we do not reach the question of the effect, if any, of petitioners' concession on their taxable income for the year in issue.↩